UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE NATIONAL SECURITY ARCHIVE,

Plaintiff,

v.

UNITED STATES CENTRAL INTELLIGENCE AGENCY,

Defendant.

Civil Action No. 99-1160 (CKK)

FILED ✓

JUL 31 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**MEMORANDUM OPINION**

Plaintiff has brought this action under the Freedom of Information Act, 5 U.S.C. § 552, seeking certain information about the CIA's intelligence activities. Before the Court is Plaintiff's Motion for Partial Summary Judgment on the single issue of whether Defendant must, pursuant to the FOIA, release information on whether it keeps biographies on certain former Eastern European heads of State. Defendant has filed an Opposition to this Motion, and Plaintiff a Reply. For the reasons elaborated below, the Court shall grant Plaintiff's Motion.

**I. BACKGROUND**

On May 2, 1995, the National Security Archive[1] filed a request under the Freedom of Information Act with the Defendant, the Central Intelligence Agency (CIA), seeking release of "all biographies and assessments . . . [of several] former leaders of Eastern European countries."

[1] The National Security Archive is a research institute affiliated with George Washington University that "systematically collects, indexes, and publishes declassified documents on foreign policy and national security topics." Compl. ¶ 4.



(n) 26

Compl., Ex. 4 (Letter from Blanton to Wright of 5/2/95).[2] In response, the CIA refused to confirm or deny whether these records exist. *See* Compl., Ex. 5 (Letter from Wright to Blanton of 5/25/95). Plaintiff appealed this refusal, but its appeal was denied. *See* Compl., Ex. 6 (Letter from Stevenson to Wright of 8/4/95); Ex. 7 (Letter from Cohen to Stevenson of 10/9/95). Plaintiff then filed an action with this Court on May 13, 1999. *See* Compl. at 1.

Plaintiff has moved for partial summary judgment on the issue of whether the CIA may properly respond to Plaintiff's request by refusing to admit or deny the existence of the biographies. Such a response is known as a "Glomar response."[3] Defendant has not objected to any fact in Plaintiff's Statement of Material Facts, and therefore the Statement will be accepted as true. *See* Def.'s Stmt. of Genuine Issues at 1. During the Cold War, the CIA targeted the Soviet Union and its East European satellites. *See* Pl.'s Stmt. of Material Facts as to which There Is No Material Issue ¶ 4 ["Pl.'s Stmt. of Facts"]. All the leaders whose biographies are at issue were heads of state, and had held other leadership positions in their respective countries. *See id.* ¶ 5. The CIA has declassified a 1961 Directive on "Biographic Intelligence" from CIA Director Allen Dulles ordering the CIA to create and maintain "complete biographic coverage of important individuals." *See id* ¶ 6, Ex. A (Biographic Intelligence Directive). In addition, the

---

[2] The leaders for whom biographies were requested are Todor Zhivkov of Bulgaria, Gustav Husak of Czechoslovakia, Erich Honecker of East Germany, Janos Kadar of Hungary, Nicolae Ceausescu of Romania, Enver Hoxha and Ramiz Alia of Albania, Josip Tito of Yugoslavia, and Wojciech Jaruzelski of Poland. *See* Compl. Ex. 4 (Letter from Blanton to Wright of 5/2/95).The National Security Archive also filed a request with the CIA for histories of CIA activity in Iran and Italy. *See* Compl. Ex. 1 (Letter from Burr to Strickland of 3/5/98). Although this request is also an issue in this lawsuit, *see* Compl. ¶¶ 9-28, it is not a subject of Plaintiff's Motion for Partial Summary Judgment, and therefore will not be addressed in this memorandum opinion.

[3] The Glomar response takes its name from the Glomar Explorer, a ship at issue in *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976).

CIA has declassified a 1969 CIA journal article on the "Biographic Handbook Program," which reveals that biographies were to be kept for "the core group . . . [of leaders] for an average country" and would consist of "35 to 50 personalities, including the heads of state and government . . ." *See* Pl.'s Stmt. of Facts ¶¶ 8-9, Ex. B at 103 (CIA journal article). The CIA also has discussed its Biographic Intelligence Programs in a publicly available recruitment brochure and in an official guidebook. *See* Pl.'s Stmt. of Facts ¶¶ 10-11, Ex. C at 18 (CIA recruitment brochure); Ex. D at 32 (CIA official guidebook). Finally, the CIA has itself declassified biographies on heads of state and on other political figures. *See* Pl.'s Stmt. of Facts ¶ 12, Ex. E (Turaki Biography); Ex. F (Daud Biography); Ex. G (Letelier Biography). The Department of State has released several CIA-prepared biographies. *See* Pl.'s Stmt. of Facts ¶ 13, Ex. H (Mikhail Gorbachev Biography); Ex. I (Raisa Gorbachev Biography). Other CIA-prepared world leader biographies have also been declassified. *See* Pl.'s Stmt. of Facts ¶ 13-14, Ex. J (Turcios Biography); Ex. K (Kagame Biography); Ex. L (Lebed Biography).

In 1999, the CIA released a book collection of declassified documents which contained excerpts from eleven biographies of Czechoslovakian, Hungarian, and Soviet leaders. *See* Pl.'s Reply to Def.'s Opp'n to Pl.'s Partial Mot. for Summ. J. at 1-2. Two of these leaders, Gustav Husak and Janos Kadar, are among the nine former heads of state whose biographies Plaintiff originally requested. *Id.* The Defendant CIA has now changed its position regarding these two biographies, and will process Plaintiff's request. *See* Def.'s Am. Resp. at 2-3.

**II. DISCUSSION**

The Freedom of Information Act (FOIA), 5 U.S.C. §552, requires agencies to "make available to the public information." *Id.* FOIA provides public access to government documents

in order "to ensure an informed citizenry, vital to the functioning of a democratic society . . . ." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Although FOIA does not apply to information that falls within one or more of nine exemptions, *see* § 552(b)(1-9), "these limited exemptions do not obscure the basic policy that disclosure, not secrecy is the dominant objective of the Act." *Department of Air Force v. Rose*, 425 U.S. 352, 361 (1976). Therefore, "the burden [is] on the agency to justify the withholding of any requested documents." *Departmentt of State v. Ray*, 502 U.S. 164, 173 (1991).

Despite agencies' burden to justify any withholding of documents, courts have shown considerable deference to agency judgment when an agency claims that a withheld document implicates national security. *See, e.g., Salisbury v. United States*, 690 F.2d 966, 970 (D.C. Cir. 1982) (holding that courts should respect agency judgment when reviewing an agency decision to withhold information in the context of national security). This deference is consistent with Congress's expectation that "[f]ederal courts, in making de novo determinations . . . [in FOIA cases] will accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed records." S. Rep. No. 93-1200, at 12 (1974). Because courts lack the national security expertise of agencies like the CIA, in these cases the question is whether "the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility . . . ." *Gardels v. CIA*, 689 F.2d 1100, 1105 (1982). "[D]eference is not equivalent to acquiescence," however, and agencies must show a logical connection between the withheld document and a conceivable harm to national security. *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998); *see also Canning v. Dep't of Justice*, 848 F. Supp. 1037, 1047 (D.D.C. 1994) (holding that agency must show a "logical nexus between disclosure

of the information in question and potential damage to the national security").

Agencies may respond to FOIA requests by refusing to confirm or deny the existence of records when the fact of the records' existence or nonexistence is itself classified. *See Philippi*, 546 F.2d at 1013. When reviewing the validity of these "Glomar responses," courts may treat the refusal to admit or deny like a refusal to produce a document that says whether or not the agency has the records. *See id.* Documents and Glomar responses that fall within a valid FOIA exemption are nevertheless subject to additional disclosure if the agency waives the exemption by officially acknowledging the document. *See Krikorian v. Dep't of State*, 984 F.2d 461, 467-68 (D.C. Cir. 1993). Requested information is officially acknowledged if (1) the requested information has already been made public through an official and documented disclosure; (2) the requested information matches the previously released information; and (3) the requested information is as specific as the previously released information. *See Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990).

A litigant is entitled to summary judgment when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate for FOIA plaintiffs "[w]hen an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption." *Petroleum Inf. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992).[4] Therefore, to rule on Plaintiff's Motion for Partial Summary Judgment this Court must first determine whether the existence of the requested biographies falls within FOIA Exemptions 1

---

[4] Defendant has not moved for full or partial summary judgment at this point in the litigation.

and 3. If the fact of the documents' existence falls within the FOIA Exemptions, the Court must then determine whether this fact has been officially acknowledged by the CIA. Such an acknowledgment would waive the exemptions.

A. *The existence of the biographies falls within Exemptions One and Two.*

1. *The existence of the biographies may be properly classified to protect national security under Exemption One.*

Exemption One protects matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order . . . ." § 552(b)(1). Clause (B) was added after the Supreme Court ruled that the original version of Exemption One did not allow courts to make a substantive inquiry into the propriety of a classification decision once it was established that a requested document was classified. *See E.P.A. v. Mink*, 410 U.S. 73, 83 (1973); Act of November 21, 1974, sec. 2, Pub. L. No. 93-502, 88 Stat. 1561 (1974). The legislative history of the 1974 amendment to Exemption One clearly demonstrates an intent to overrule the *Mink* interpretation of Exemption One and to give courts the responsibility to review classification decisions to ensure that these decisions comply with the standards in the governing executive order.[5] Because successive presidential administrations have issued different and

---

[5] For an account of the legislative history of the 1974 FOIA amendment, see *Ray v. Turner*, 587 F.2d 1187, 1192-95, 1199-1214 (D.C. Cir. 1978); *see also* 120 Cong. Record S36970 (statement of Sen. Muskie) (supporting amendment in order to override *E.P.A. v. Mink*); S36878 (statement of Sen. Byrd) (supporting amendment in order to override *E.P.A. v. Mink*); S36866 (statement of Sen. Kennedy) ("Judicial review will be effective only if a Federal judge is authorized to review classification decisions objectively, without any presumption in favor of secrecy."). While expanding judicial review under Exemption One, Congress cautioned courts to pay some deference to agency judgments. *See* S. Rep. No. 93-1200, at 12 ("the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of public disclosure of a particular classified

superseding executive orders establishing different classification guidelines, the initial question is which executive order governs.[6] This Circuit has held that the controlling executive order is the order in effect at the time the classifying official acted. *See Lesar v. Dep't of Justice*, 636 F.2d 472, 480 (1980). If a document classified under a previous order is reevaluated when a new order is in effect, however, the new order controls. *See Military Audit Project v. Casey*, 656 F.2d 724, 737 (D.C. Cir. 1981). Therefore, even though the existence of these documents was originally classified under Executive Order 12,356, the fact that they were reevaluated under Executive Order 12,958 means that Executive Order 12,958 controls. *See* Decl. of William H. McNair ¶ 26 (stating that the classified nature of the existence of the documents was reevaluated under Exec. Order 12,958 after Plaintiff's FOIA request was made).

Executive Order 12,958 permits the classification of material relating to "foreign government information . . . intelligence activities . . . [and] foreign relations." Exec. Order 12,958 § 1.5(b-d) (other inapplicable categories omitted). Such information may be classified only if "unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, and the [classifying agency] is able to identify or describe the damage." § 1.2(a)(4). By requiring agencies to identify or describe the damage that could result from unauthorized disclosure, and by providing for extensive declassification procedures for historical records, Executive Order 12,958 creates a presumption against declassification and toward disclosure.[7]

---

record.")

[6] The current executive order governing classification decisions is Exec. Order No. 12,958, 3 C.F.R. 333 (1996). This order superseded Exec. Order No. 12,356, 47 Fed. Reg. 14,874 (1982).

[7] The Preamble of Executive Order 12,958 shows the intent behind this change in the classification regime. *See* Exec. Order No. 12,958, 3 C.F.R. 333 at 334 ("Protecting information

Although courts review FOIA determinations *de novo*, in national security cases an agency's judgment will receive significant deference. *See Goldberg v. Dep't of State*, 818 F.2d 71, 77 (D.C. Cir. 1987). Agencies have more expertise and experience in the national security arena than courts do, and therefore their judgment warrants deference as long as the agency can demonstrate a logical connection between a withheld document and an alleged harm to national security. *See Washington Post v. U.S. Dep't of Defense*, 766 F. Supp. 1, 7 (D.D.C. 1991) ("[O]ur Court of Appeals has, in the absence of any contradictory evidence, required little more than a showing that the agency's rationale is logical.").

The CIA has alleged multiple potential damages that could result from disclosure, some of which are plausible enough to pass the highly deferential test prescribed for these national security cases. The CIA first alleges that revealing whether individuals have been targeted by the CIA alerts those individuals to the CIA's interest. *See* Decl. of William H. McNair ¶¶ 16-17. This knowledge allows targeted individuals to take countermeasures to avoid detection and allows untargeted individuals to "act with impunity" because they have evaded CIA interest. *Id.* Although this theory may have some validity when applied to *living* individuals, it has little relevance for those who are deceased. Deceased persons will not avoid detection or act with impunity as a result of anything the CIA does. While this CIA theory may justify the withholding of information on the two leaders who are still alive, it cannot justify the withholding of information on the five leaders who are deceased.

---

critical to security is a priority, but dramatic changes have altered threats . . . and we can emphasize our commitment to open government."). *Compare* Exec. Order No. 12,958 (requiring agencies to "identify or describe the damage" that could result from disclosure) *with* Exec. Order No. 12,356 (placing no such requirement on agencies).

The CIA also argues that disclosing which leaders it keeps biographic intelligence on would reveal how the CIA allocates its resources, and therefore might help adversaries determine how best to deploy their counterintelligence measures. *See id.* ¶¶ 19-22. This knowledge would frustrate intelligence-gathering and potentially harm national security. *See id.* A disclosure of the fact that the CIA compiled biographic intelligence on Eastern European heads of state could alert counterintelligence in those countries and other countries to the CIA's priorities, and could allow them to subvert CIA efforts. *See id.* Although Plaintiff argues that "it has been long been obvious that the East European communist bloc countries and their leaders were CIA intelligence targets," Pl.'s Mot. for Partial Summ. J. at 13, the substantial weight accorded agency evaluations dictates that this Court defer to the CIA's plausible explanations for its actions.[8] Once the CIA has given a reasonable explanation for withholding this information, this Court is not empowered to compel the CIA to reveal it merely because the information is deemed to be "obvious." *Cf. Assassination Archives and Research Ctr. v. CIA*, 720 F. Supp. 217, 221 (D.D.C. 1989) (rejecting argument that information should be declassified because it was "old.").

Moreover, the revelation of CIA interest in particular foreign nationals could damage foreign relations, and therefore its classification is justified under Executive Order 12,958 §1.5(d). As the CIA argues, "official acknowledgment that CIA maintains information concerning a particular foreign national may be construed by a foreign government as evidence that the CIA has been active within that country . . . ." *See* Decl. of William H. McNair ¶ 23.

---

[8] The Court shall address Plaintiff's further argument that the "obviousness" of CIA biographic intelligence on these leaders places the information in the public domain in its discussion of whether the CIA has waived its exemptions.

Such an official admission could harm foreign relations even if the "obvious" information were known unofficially. *See Phillippi v. CIA*, 655 F.2d 1325, 1332-33 (D.C. Cir. 1981).

2. *The Existence of the Biographies May Be Withheld to Protect Intelligence Sources and Methods Under Exemption 3*

Exemption Three protects matters that are "specifically exempted from disclosure by statute . . . provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of material to be withheld." 5 U.S.C. §552(b)(3). The CIA Director is authorized by statute to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-3(c)(6). This statute refers to a particular type of material to be withheld (intelligence sources and methods), and therefore falls under Exemption Three.[9]

The Exemption Three analysis is substantially the same as the Exemption One analysis, with two major differences. First, under Exemption Three the CIA may only protect intelligence sources and methods; the CIA cannot use Exemption Three to protect matters that could harm foreign relations. Second, Exemption Three does not require the CIA to show a reasonable expectation of damage to the national security. *Cf. CIA v. Sims*, 471 U.S. at 169 ("The Director

---

[9] The responsibilities of the CIA Director, including the responsibility to protect intelligence sources and methods, were originally set forth in the National Security Act of 1947. *See* National Security Act of 1947, sec. 102(d)(3), Pub. L. No. 80-253, 61 Stat. 498. In its original incarnation, this statute was held to be an Exemption Three statute by the Supreme Court and the DC Circuit. *See CIA v. Sims*, 471 U.S. 159, 187 (1985); *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982). The Intelligence Renewal and Reform Act of 1996 repealed § 403(d) and replaced it with §403-3(c)(6). *See* Intelligence Renewal and Reform Act of 1996 § 805(a), Pub. L. No. 104-293, 110 Stat. 3477 (1996).

of CIA has very broad authority to protect all sources of intelligence information from disclosure"). When reviewing Exemption Three claims, courts in the District of Columbia Circuit must "determine only whether there is a relevant statute and whether the document falls within that statute." *Krikorian v. Dep't of State*, 984 F.2d 461, 465 (D.C. Cir. 1993).

Because § 403-3(c)(6) is an Exemption Three statute, the only remaining question is whether the requested information falls within the statute, *i.e.*, whether its disclosure could reveal intelligence sources and methods. As discussed previously in the Exemption One analysis, revealing whether or not the CIA has biographies on certain leaders provides clues as to the CIA's priorities, and thereby betrays some degree of information about intelligence sources and methods. *See supra* p. 10. Accordingly, the information that the CIA has withheld is protected by Exemption Three as well as Exemption One.

B. *The CIA has officially acknowledged the existence of these biographies, and therefore has waived the FOIA exemptions.*

Even if the information the CIA is withholding falls within one or more FOIA exemptions, those exemptions can be waived if the CIA has made an official acknowledgment that the biographies exist. *See Krikorian*, 984 F.2d at 467. The D.C. Circuit has held that a FOIA exemption is waived when (1) the requested information has already been made public through an official and documented disclosure; (2) the requested information matches the previously released information; and (3) the requested information is as specific as the previously released information. *See Fitzgibbon*, 911 F.2d at 765. Although under this stringent test this Circuit has construed official acknowledgments narrowly, it has also recognized that "suppression of well-acknowledged information of that sort would frustrate the pressing policies

of the Act without even arguably advancing countervailing considerations." *Founding Church of Scientology v. Nat'l Security Agency*, 610 F.2d 824, 832 (D.C. Cir. 1979). In analyzing whether the CIA has waived its FOIA exemptions, the Court will first address the general question of whether an exemption can be waived because the information it covers is in the public domain. The Court will then turn to the more specific question of whether any of the released documents that Plaintiff has produced constitutes an official acknowledgment that waives the FOIA exemptions.

1. *Public domain information*

Even if the fact of CIA biographic intelligence on Eastern Europe constitutes common knowledge in the public domain, information in the public domain still may be withheld if it has received no official acknowledgment. *See Afshar v. Dep't of State*, 702 F.2d 1125, 1130-31 (D.C. Cir. 1983) ("official acknowledgment by an authoritative source might well be new information that could cause damage to the national security"). This Circuit has recognized that even if information is publicly known, the stamp of truth that accompanies official disclosure can be damaging. *See Abbotts v. Nuclear Regulatory Comm'n*, 766 F.2d 604, 607-08 (D.C. Cir. 1985) (distinguishing between information in the public domain and information that reveals official policy); *Billington v. Dep't of Justice*, 11 F. Supp. 2d 45, 56 (D.D.C. 1998) ("[D]isclosure of even publicly known intelligence methods could . . . provide hostile analysts with classified information). Therefore, the *Fitzgibbon* test requires "an official and documented disclosure" to trigger a waiver, even if the information is "obvious," as Plaintiff has argued. *See Fitzgibbon*, 911 F.2d at 765; Pl.'s Mot. for Partial Summ. J. at 13. Without a specific document or set of documents that constitutes official acknowledgment of an issue, presence in the public

domain does not waive the CIA exemption. Accordingly, the specific documents submitted by Plaintiff must be analyzed to determine whether any of them constitutes an official and documented disclosure.

2. *The release of information by other government agencies*

Plaintiff has submitted several CIA-produced biographies that were released by other agencies. *See* Pl.'s Stmt. of Facts ¶ 13, Ex. H (Mikhail Gorbachev Biography); Ex. I (Raisa Gorbachev Biography); Ex. J (Turcios Biography); Ex. K (Kagame Biography); Ex. L (Lebed Biography). The release of these documents, however, does not waive the CIA's privilege to withhold the biographies in question from Plaintiff. Disclosure by other agencies of CIA information does not preempt the CIA's ability to withhold that information. *See, e.g.*, *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999) (holding that OPM release of information on CIA employee does not waive CIA's privilege to withhold that information); *cf. Pfeiffer v. CIA*, 721 F. Supp. 337, 342 (D.D.C. 1989) (holding that former CIA employees cannot waive a CIA exemption); *Schlesinger v. CIA*, 591 F. Supp. 60, 66 (D.D.C. 1984) (holding that CIA clearance of an outside party's book does not waive a CIA exemption). Only an official disclosure by the CIA can waive a CIA exemption. *See Frugone*, 169 F.3d at 775.

3. *The release of other biographies by the CIA*

Plaintiff has also produced several biographies of world leaders officially released by the CIA, arguing that the declassification of these biographies has "disclosed the fact that [the CIA] keeps world leader biographies." Pl.'s Mot. for Partial Summ. J., p. 12; *see* Pl.'s Statement of Facts ¶ 12, Ex. E (Turaki Biography); Ex. F (Daud Biography); Ex. G (Letelier Biography). But this Circuit has not accepted the argument that release of parts of a classified matter compels

release of the whole classified matter. In *Military Audit Project v. Casey*, 656 F.2d 724, 754 (D.C. Cir. 1981), the Court concluded that a rule compelling full disclosure when any part is disclosed would "work mischief," because agencies would be inclined to declassify less information for fear that disclosures of non-secure information would force broader disclosures that could jeopardize secure information. This Circuit has also held that previous disclosure of similar information does not compel later disclosure. *See Salisbury v. United States*, 690 F.2d 966, 971 (D.C. Cir. 1982). Furthermore, under the *Fitzgibbon* test these biographies on different individuals do not match the biographies Plaintiff is seeking to disclose. *See Fitzgibbon*, 911 F.2d at 765. Therefore, the CIA's previous release of world leader biographies does not compel it to disclose whether it has information on these world leaders.

D. *The release of information on the scope of the Biographic Intelligence Program*

Plaintiff has also produced various documents on the scope of the Biographic Intelligence Program, arguing that through these documents the CIA disclosed the fact that it kept biographies on all world leaders. Plaintiff has shown that the CIA has declassified a 1961 Directive ordering the CIA to maintain "complete biographic coverage of important individuals." *See* Pl.'s Statement of Facts ¶ 6, Ex. A (Biographic Intelligence Directive). The CIA also discussed its Biographic Intelligence Program in a recruitment brochure and handbook. *See* Pl.'s Stmt. of Facts ¶¶ 10-11, Ex. C at 18 (CIA recruitment brochure); Ex. D at 32 (CIA official guidebook). The CIA argues correctly that while these disclosures "acknowledged the existence of a Biographical Intelligence Program," they did not disclose "the identity of those individuals who are, and who are not, the subject of [biographical] coverage." Def.'s Opp'n to Pl.'s Mot. for Partial Summ. J., pp. 3-4. A revelation that the CIA keeps biographies does not obligate the CIA

to disclose which individuals it keeps biographies on. If the CIA has disclosed that it keeps biographies on certain individuals or certain classes of individuals, however, that disclosure does waive the CIA's ability to deny that information. *See Founding Church of Scientology*, 610 F.2d at 832.

Exhibit B in Plaintiff's Motion for Partial Summary Judgment is a declassified CIA journal article on the "Biographic Handbook Program." This document reveals that biographic intelligence encompassed "the core group . . . [of leaders] for an average country" and would consist of "35 to 50 personalities, including the heads of state and government . . ." Pl.'s Statement of Facts ¶¶ 8-9, Ex. B at 103 (CIA journal article). The crucial question remaining for this Court is whether this admission discloses that the CIA kept biographies on the Eastern European heads of state in question.

Under the *Fitzgibbon* test for waivers, the official CIA declassification is an official and documented disclosure. The declassification was approved for release by the CIA Historical Review Program in 1994. *See* Decl. of Thomas Blanton ¶ 10. To qualify as a waiver, the article also must match the information requested. Because the declassified article reveals that biographic intelligence "includ[ed] the heads of state and government," the article matches Plaintiff's request that CIA admit that it has biographic intelligence on particular heads of state.[10]

The information released by the article is also as specific as the information requested by

---

[10] The article's admission that biographies were kept on heads of state does not, however, matches the request in Plaintiff's Complaint for release of the contents of particular biographies. This Court's holding that the article matches the limited information requested in Plaintiff's Motion for Partial Summary Judgment should not imply that the article waives the CIA's privilege to withhold the contents of any of these documents if disclosure of those contents could reasonably result in damage to the national security.

Plaintiff. Even though the CIA has not specifically admitted that it compiled biographies on the specific heads of state in question, the CIA has admitted that it keeps biographies on *all* heads of state. If the CIA were to disclose that it kept a biography on a specific head of state like Erich Honecker or Nicolae Ceausescu, this disclosure would not reveal any information that has not already been revealed by the previous disclosure that the CIA kept biographic intelligence on all heads of state. Even though Plaintiff requests confirmation of the existence of specific biographies while the CIA article discusses the general scope of biographic intelligence, the specific information that the CIA kept biographies on these particular prominent heads of state is part and parcel of the CIA's admission that it kept biographies on *all* heads of state.

Because "head of state" is a clear and narrowly defined term which is not subject to multiple interpretations, there can be little dispute about who is a head of state and who is not. Given the specificity of this term, the revelation that the CIA has kept biographies on particular heads of state does not disclose any additional aspects of the CIA's intelligence priorities.[11] Other targeted categories discussed in the article are potentially more elastic, such as "key figures in the country's economic life." *See* Pl.'s Statement of Facts Ex. B at 103 (CIA journal article).

---

[11] The only possible additional information conveyed by an admission that the CIA has a biography on a particular head of state is the revelation that the CIA has targeted that country for biographic coverage. Nonetheless, the CIA has not argued in this litigation that the requested information should be withheld because it might disclose on which countries the CIA kept biographic intelligence. On the contrary, the CIA does not dispute Plaintiff's assertion that "[d]uring the Cold War much of United States intelligence interest was focused on the Soviet Union and its East European satellites . . . [and the] CIA, in particular, targeted these countries." Pl.'s Stmt. of Facts ¶ 4; *see* Def.'s Stmt. of Genuine Issues at 1. Moreover, the CIA admitted in a publicly available official guidebook that it produced "biographic reports of major leaders from *all* countries." *See* Pl.'s Statement of Facts Ex. D at 32 (CIA official guidebook) (emphasis added).

The CIA has the discretion to define this category in different ways, targeting different individuals. Were the CIA to reveal which persons it considered to be "key figures," it might also disclose how the CIA exercises its discretion and, therefore, ultimately betray intelligence methods and priorities to an extent not waived by the article's admission. As a discrete category, however, "heads of state" leaves no room for agency discretion. Indeed, the journal article's admission that the biographic intelligence program targeted all heads of state already conveys any information about intelligence priorities that could be conveyed by revealing the existence of biographic intelligence for individual heads of state.

Plaintiff's request does not use a CIA admission to obtain more specific information, an approach that violates the *Fitzgibbon* test and that has been rejected by this Circuit. *See Public Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C. Cir. 1993) (holding that general agency testimony about documents before a congressional committee does not waive Exemption One privilege to withhold those documents); *cf. Rothschild v. Dep't of Energy*, 6 F. Supp. 2d 38, 40-41 (D.D.C. 1998) (releasing memo about an agency meeting does not waive Exemption 5 privilege to withhold information about the meeting). In these cases plaintiffs attempted to use the admission of some facts to compel disclosure of other facts. This approach was soundly rejected by the courts. In the instant case, however, the CIA has already admitted that it holds a full deck of cards—biographic intelligence on all heads of state. Now the CIA is attempting to deny that it has specific cards. To hold that the CIA has the authority to deny information that it has already admitted would violate the core principles of FOIA without providing any conceivable national security benefit. Indeed, national security can only be harmed by the lack of trust engendered by a government denial of information that it has already admitted. Because

the CIA has waived its FOIA exemptions to the existence of biographies on heads of state through its declassification of the journal article, Plaintiff's Motion for Partial Summary Judgment shall be granted.

The limited nature of this Court's holding should be reemphasized. The CIA does not have to admit or deny the existence of these biographies because other biographies have been released, because their existence is "obvious," or because the Cold War is over. This Court accords great deference to the CIA's expert judgment in national security matters. Although the agency could have withheld this information under FOIA Exemptions One and Three, it waived these exemptions through its disclosure. Once information has been officially made public by an agency, there is no benefit from continued denial.

Another Circuit has suggested that courts "are now only a short step from exempting all CIA records from FOIA." *Hunt v. CIA*, 981 F.2d 1116, 1120 (9th Cir. 1992). But the deference given to agency judgments in national security matters does not imply that courts have no power to review agency judgments in this area. *See Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998). Plaintiffs certainly face a "high hurdle" to prove that an agency has waived its exemption, but on this limited issue Plaintiff has cleared this hurdle. *See Public Citizen v. Dep't of State*, 11 F.3d at 203. Exemption One was amended by Congress in 1974 to create a substantive role for courts to review agency decisions on the release of national security information. The legislative history clearly supports the D.C. Circuit's interpretation that "deference is not equivalent to acquiescence." *Campbell*, 164 F.3d at 30. In this narrow case where the CIA has clearly disclosed the information requested and waived its FOIA exemptions, partial summary judgment for the Plaintiff is justified.

## III. CONCLUSION

With no waiver, the CIA's refusal to admit or deny whether it has biographies of the heads of state in question would be justified. Under Exemption One, release of this information could reveal clues about the CIA's resource allocation and could damage foreign relations. Under Exemption Three, disclosure could reveal information about intelligence methods that the CIA Director has the authority and the responsibility to keep secret. The CIA's exemptions, however, have been waived. The fact that the collection of these biographies is "obvious" does not waive the exemption, because official confirmation provides a validation which can be legitimately withheld, even for widely known information. Release by other agencies of information on the biographic program also cannot waive the exemptions, because only the CIA can waive its privilege. The CIA's release of other biographies does not waive the exemptions, because the release of some information does not compel release of similar or related information. The CIA's exemptions are waived, however, by its 1994 admission that its biographic collection program collected biographies on heads of state. After making that admission, the CIA cannot now claim that it does not have information on specific heads of state. Accordingly, Plaintiff's Motion for Partial Summary Judgment shall be granted. An order accompanies this memorandum opinion

July 31 2000

COLLEEN KOLLAR-KOTELLY
United States District Judge